IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VETO MENDOZA,

                          Petitioner,

       v.

C. GIPSON, Warden,

                         Respondent.

Case No. 1:12-cv-00596 MJS (HC)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Lewis A. Martinez of the office of the California Attorney General. Both parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 4, 9.)

**I.**    **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by a jury on April 21, 2009 of assault with a deadly weapon and various enhancements. (Clerk's Tr. at 191-92.) On June 23, 2009, the trial court sentenced Petitioner to serve a determinate term of fifteen years in jail. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

1    District. On January 27, 2011, the court affirmed the judgment. (Lodged Doc. 2.)

2    Petitioner filed a petition for review with the California Supreme Court on March 2, 2011.

3    (Lodged Doc. 3.) The Supreme Court summarily denied the petition on April 13, 2011.

4         Petitioner filed the instant federal habeas petition on April 16, 2012. (Pet., ECF

5    No. 1.) In his petition, Petitioner presents two claims for relief: 1) that the denial of

6    Petitioner's motion for mistrial constituted an abuse of discretion and violated due

7    process; and 2) that the denial of the motion for mistrial resulted in a lessening of the

8    state's burden of proof regarding Petitioner's claim of self-defense, thereby violating his

9    right to a fair trial. (Pet. at 11.)

10        Respondent filed an answer to the petition on August 28, 2012, and Petitioner

11   filed a traverse to the answer on November 9, 2012. (Answer and Traverse, ECF Nos.

12   13, 19.) The matter stands ready for adjudication.

13   **II.    STATEMENT OF THE FACTS[11]**

14        **PROCEDURAL SUMMARY**

15        On June 9, 2008, the Fresno County District Attorney charged
     defendant with corporal injury to a cohabitant with a prior (Pen. Code, §
16   273.5, subd. (e);[2] count 1), assault with a deadly weapon (§ 245, subd.
     (a)(1); count 2), and misdemeanor resisting a police officer (§ 148, subd.
17   (a)(1); count 3). The information also alleged as to count 2 that defendant
     personally inflicted great bodily injury (§ 12022.7, subd. (a)),  [*2] served
18   two prior prison terms (§ 667.5, subd. (b)), suffered a prior conviction
     within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i),
19   1170.12, subds. (a)-(d)), and suffered a prior serious felony conviction (§
     667, subd. (a)(1)). Defendant pled not guilty by reason of insanity.
20
          A jury found defendant guilty of battery on a cohabitant (§ 243,
21   subd. (e)(1)), as a lesser included offense to count 1, and guilty as
     charged on count 3. The jury deadlocked on count 2. Defendant withdrew
22   his plea of not guilty by reason of insanity on counts 1 and 3 and entered a
     plea of not guilty on those counts. The court sentenced defendant to one
23   year in jail.

24        On February 18, 2009, the district attorney refiled an information
     charging defendant with assault with a deadly weapon (§ 245, subd.
25   (a)(1); count 1). The information also alleged that defendant personally

26   _____
     [1]The Fifth District Court of Appeal's summary of the facts in its April 14, 2011 opinion is presumed correct.
27   28 U.S.C. § 2254(e)(1).

     [2] All statutory references are to the Penal Code unless otherwise noted.
28

2

1   inflicted great bodily injury (§ 12022.7, subd. (a)), served two prior prison
    terms (§ 667.5, subd. (b)), suffered a prior conviction within the meaning
2   of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)),
    and suffered a prior serious felony conviction (§ 667, subd. (a)(1)).
3   Defendant pled not guilty.

4       A jury found defendant guilty as charged. It also found true the
    great bodily injury allegation and the prior conviction allegations, and it
5   determined that defendant was sane at the time he committed the offense.
    The court sentenced defendant to 15 years in prison.

6   **FACTS**

7       Defendant's contentions relate only to the conviction for assault
8   with a deadly weapon. The following facts were elicited at the second trial.

    Ursula
9
10      Ursula testified that she and defendant had been involved in an on-
    and-off relationship for about 12 years. On January 26, 2008, at about
11  11:00 p.m., she and defendant left Ursula's house and walked in the rain
    to find something to eat at Belmont and First. They had been drinking and
12  they were arguing. At the corner of Belmont and Mariposa, their argument
    became physical. Ursula wanted to go back home and defendant started
13  pushing her on her chest. He choked her for more than 30 seconds,
    during which time she could not breathe, then he kicked her. Her face was
14  bruised.

15      Two people in a car stopped to help Ursula. They urged her to get
    in their car, but she did not know who they were and she ran away. While
16  Ursula was present, the two people were there for less than four minutes
    and she did not hear anything spoken between the two people and
17  defendant. Ursula did not see defendant fight with anyone else that night.

18  Jason

19      Jason was driving on Belmont that night. He and his girlfriend Anita
    were taking Anita's friend, Angela, to her house. Jason was wearing
20  pajamas, a sweater, and slippers; they were not planning to go anywhere
    else. As he was driving, he saw a fight occurring between two people.
21  Because it was dark and both participants had long hair, Jason assumed
    they were both girls. There was no traffic, so Jason slowed down and
22  stopped the car to make sure everything was okay. When he realized the
    aggressor was a man, he got out to intervene and make sure the woman
23  was all right. He thought helping a woman was the right thing to do.
    Defendant had a hand on Ursula and she was crying and trying to get
24  away. Jason did not know either defendant or Ursula, and he did not know
    how their altercation had started. Jason approached defendant and Ursula
25  and asked what was going on and told them to stop fighting. Jason had no
    weapon and he did not threaten defendant in any way.

26      Defendant turned, said something to Jason, and struck him on the
27  right side of his face. Jason backed away in shock, then struck back with a
    closed fist, hitting defendant five or six times on his face and upper body.
28  When defendant fell, Jason backed away and noticed defendant was
    holding a knife with a four- to six-inch blade. Jason did not want to get

3

stabbed, so he retreated, losing a slipper as he returned to the car. After getting into the car, he drove up onto the sidewalk to separate defendant and Ursula on either side of the car. Then Jason backed the car away and drove off. He estimated the entire incident lasted only two or three minutes. He did not think either Anita or Angela had exited the car.

Jason felt the pain from being hit, and he soon realized he was tasting blood. He made a U-turn and drove to the hospital. Meanwhile, Anita called 911. At the hospital, Jason was treated for a six-inch stab wound on the right side of his face. The knife had completely penetrated his cheek, hitting his teeth and gums. He required 20 stitches, antibiotics, and morphine. At the time of trial, he still had a scar and he continued to suffer uncontrollable muscle spasms three or four times per week, lasting 30 to 120 minutes.[3]

Anita

Anita, who was riding in the front passenger seat, testified that she also initially thought defendant and Ursula were both women because of their hair. She saw one person pushing the other into the wall. Anita said, "Oh my God," and Jason said, "Oh shit. That girl is getting her ass beat." Anita could hear defendant yelling and cussing at Ursula, saying, "I'm going to beat your ass." Ursula was crying and Anita was concerned for her. Jason stopped the car and got out. Jason said, "Hey, you need to calm down." Anita said, "Jason, what are you doing?" She kept her gaze on defendant and Ursula. Jason told defendant, "Hey, you need to knock it off." Defendant told Jason, "Mind your own business. Get the fuck back in your car. Leave us alone." Anita got out of the car and stood about six or eight feet from the action. Ursula backed away eight or 10 feet, still crying and sobbing loudly.

When Jason told defendant to calm down, defendant turned, came toward Jason, and swung at his face. Anita thought defendant made contact. However, she could not see the right side of Jason's body and therefore could not yet tell if Jason was injured. In response to defendant's swing, Jason hit defendant six or seven times with a closed fist.

Anita first testified that defendant then fell to the ground, came back at Jason, and stabbed him. But upon further questioning, she explained in detail that after defendant fell to the ground, Jason backed up and she was able to see that he was injured and bleeding from the right side of his face. She saw a knife in defendant's left hand and she yelled at Jason to get into the car. Jason then backed up, losing his slippers, and returned to the car. Meanwhile, defendant moved back toward Ursula, and Anita heard him yell at Ursula, "Stay right there or I'm going to kill you."

The prosecutor tried to clarify Anita's testimony by asking, "After the initial strike that you saw [defendant] take at [Jason] and then the six or seven punches [Jason] gave to the defendant[,] did you ever see them make contact with each other after that?" Anita responded, "[Defendant] is falling, he's still trying to swing but not connecting." The prosecutor again asked, "Did you ever see [defendant] connect with [Jason's] face after that

---

[3] Jason testified that he had suffered a prior conviction for vehicle theft in 2002, and for evading an officer in 2005.

initial strike [defendant] took?" Anita answered, "Um, I couldn't really see that side but he swang [sic] and I don't know if he did or didn't."

Jason was bleeding heavily and Anita was afraid for him. Jason started driving toward the hospital and Anita called 911. She was confused, scared, and upset, and she mistakenly reported that a man was stabbing a woman. Later, officers took Anita from the hospital back to the crime scene, where she identified defendant, Ursula, and the knife.

## Officer Ressler

Officer Ressler and Officer Phebus were dispatched to the crime scene. They parked their unmarked car on Mariposa, south of Belmont. They could hear a male yelling, then they saw defendant yelling at Ursula in the alley just south of (and parallel to) Belmont and east of Mariposa. The two uniformed officers exited the car and approached on foot. The officers drew their firearms because they believed someone was armed. As they approached with their weapons pointed at defendant, they identified themselves as police and ordered defendant and Ursula to the ground. The officers did so at least three times, while defendant stood and looked directly at them from a distance of about 23 feet. Then defendant [*9] turned and slowing started walking away down the alley. After he took a few steps, another officer who had arrived on the scene rushed and tackled him from behind. Defendant was arrested and searched for weapons, but none was found on his person.

## Officer Gregory

When Officer Gregory and his partner arrived on the scene, Ursula appeared to be upset and she was still crying. She told the officers she and defendant were in an argument. She had scratches on her face and bruising in her eye area. Defendant was very upset and had some faint scratches on his neck or chest, which the officer did not notice until later. He smelled strongly of alcohol and exhibited other signs of being under the influence.

## Officer Sotelo

Officer Sotelo examined the crime scene on the southwest corner of Belmont and Mariposa. It was dark and rainy, but he found blood and two slippers on the sidewalk, and a knife in the parking lot adjacent to the alley. The officer attempted to cover and preserve the evidence from the rain.

## Crime Scene Technician

The technician marked and processed the evidence at the crime scene. The knife was a black-handled kitchen knife with a blade of approximately two and one-half inches long.

## Officer Dennis

Officer Dennis was dispatched to the hospital to contact the victim of a stabbing. He found Jason with a large cut on his right cheek that was bleeding heavily onto his face and into his mouth. The staff was attempting to stop the bleeding. Meanwhile, over the course of about 90

1
2
3
4
5
6

minutes and while he was being treated, Jason told the officer what happened. Jason had to take breaks because of his pain. He told the officer that he stopped the car because he saw two people fighting on the corner of Belmont and Mariposa. He intended to break up the fight. When he approached, he saw a male choking a female, grabbing her neck and lifting her off the ground. He pulled the male by his shoulders and told him to stop hitting the female. The male then turned and struck Jason on the right side of his face. Jason immediately struck the male to defend himself. At that time, Jason started tasting blood in his mouth. He stepped back to separate himself from defendant and he saw a large knife in defendant's hand.

7

People v. Mendoza, 2011 Cal. App. Unpub. LEXIS 694, 1-10 (Cal. App. 5th Dist. Jan. 27, 2011)

8

**III.    GOVERNING LAW**

9

**A.    Jurisdiction**

10

Relief by way of a petition for writ of habeas corpus extends to a person in

11

custody pursuant to the judgment of a state court if the custody is in violation of the

12

Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

13

2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

14

suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

15

conviction challenged arises out of the Fresno County Superior Court, which is located

16

within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court

17

has jurisdiction over the action.

18

**B.    Legal Standard of Review**

19

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

20

Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

21

filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

22

114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

23

the AEDPA; thus, it is governed by its provisions.

24

Under AEDPA, an application for a writ of habeas corpus by a person in custody

25

under a judgment of a state court may be granted only for violations of the Constitution

26

or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.

27

7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

28

state court proceedings if the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.   Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).   The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).   For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.   Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).   A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable."   Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."   131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."   Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)).   Further, "[t]he more general the rule, the more leeway courts

7

1  have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S.

2  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

3  Federal law for a state court to decline to apply a specific legal rule that has not been

4  squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

5  (2009), quoted by Richter, 131 S. Ct. at 786.

6  <center>2.  Review of State Decisions</center>

7  "Where there has been one reasoned state judgment rejecting a federal claim,

8  later unexplained orders upholding that judgment or rejecting the claim rest on the same

9  grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the

10  "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

11  (9th Cir. 2006).  Determining whether a state court's decision resulted from an

12  unreasonable legal or factual conclusion, "does not require that there be an opinion from

13  the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

14  "Where a state court's decision is unaccompanied by an explanation, the habeas

15  petitioner's burden still must be met by showing there was no reasonable basis for the

16  state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does

17  not require a state court to give reasons before its decision can be deemed to have been

18  'adjudicated on the merits.'").

19  Richter instructs that whether the state court decision is reasoned and explained,

20  or merely a summary denial, the approach to evaluating unreasonableness under §

21  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

22  or theories supported or, as here, could have supported, the state court's decision; then

23  it must ask whether it is possible fairminded jurists could disagree that those arguments

24  or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

25  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

26  was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves

27  authority to issue the writ in cases where there is no possibility fairminded jurists could

28  disagree that the state court's decision conflicts with this Court's precedents." Id. To put

<center>8</center>

it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.   Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin v. Lamarque, 555 F.3d at 834.

## IV.   REVIEW OF PETITION

### A.   Claim One – Denial of Mistrial Motion Based on Mention of Petitioner's Parole Status

Petitioner contends the trial court's denial of a motion for mistrial constituted an abuse of discretion and a denial of due process under the Fifth and Fourteenth

1    Amendments." (Pet. at 3.) Specifically, Petitioner claims a police officer's testimony that

2    Petitioner was on parole at the time of arrest violated his due process rights. (Id.)

3                          1.    State Court Decision

4           Petitioner presented his claim in his direct appeal to the California Court of

5    Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

6    Court of Appeal and summarily denied in subsequent petition for review by the California

7    Supreme Court. (See Lodged Docs. 1-2.)  Since the California Supreme Court denied

8    the petition in a summary manner, this Court "looks through" the decisions and

9    presumes the Supreme Court adopted the reasoning of the Court of Appeal, the last

10   state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797,

11   804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that

12   higher court agrees with lower court's reasoning where former affirms latter without

13   discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000)

14   (holding federal courts look to last reasoned state court opinion in determining whether

15   state court's rejection of petitioner's claims was contrary to or an unreasonable

16   application of federal law under 28 U.S.C. § 2254(d)(1)).

17          In denying Petitioner's claim, the Court of Appeal explained that:

18                 Defendant contends the trial court abused its discretion and
                   violated due process when it denied his motion for mistrial based on
19                 mention of his parole status at trial. We conclude  the error was harmless.

20   **I. Facts**

21          During Officer Gregory's testimony, the following occurred:

22                 "[PROSECUTOR:] ... Did you notice anything about the
                   defendant when you contacted him?
23
24                 [OFFICER GREGORY:] He was — initially smelled a strong
                   odor of alcohol on his breath. He appeared to be very upset,
                   obviously.
25
                   [PROSECUTOR:] What made you believe that he was
26                 upset?

27                 "[OFFICER GREGORY:] That the police were there, he was
                   on parole and —
28

                                         10

1

"[DEFENSE COUNSEL]: Objection, your Honor.

2

3

"THE COURT: Sustained. And ladies and gentlemen, I'm going to go ahead and we'll take our recess at this time. And I'm going to order that answer be stricken, not considered for any purpose. And we'll get this room cooled down for you. [¶] Remember the admonition not to form or [express] any opinion about the case. And we'll return in about 20 minutes ....

4

5

"(Whereupon the jury exited the courtroom.)

6

7

"THE COURT: All right. Anything else? I don't know if the admonishment was sufficient for you."

8

9

At this point, defense counsel requested a recess to consider the matter. Back on the record, he requested a mistrial, arguing that the information was too inflammatory for defendant to get a fair trial.

10

11

The prosecutor argued that defendant was going to take the stand and would be impeached by several prior convictions, which would lessen the prejudicial effect of the information.

12

13

The court concluded it could not weigh the prejudicial effect because defendant had not yet decided whether he would testify. The court took the motion under advisement.

14

15

After the prosecution rested and defendant decided not to testify, the court reconsidered the motion for mistrial. The court stated:

16

17

18

19

20

"As I mentioned earlier I would think that the defendant's exercise of his right not to be called as a witness against himself makes this a closer call and squarely puts the Court in the position of deciding whether or not the mention of the defendant's parole status is such a prejudicial matter [that] we have to concede the fact that it is prejudicial. And we have to concede that the — issue is closer. However, is it so prejudicial that it cannot be cured by an admonishment to the jury or further admonishment or some other remedy short of a mistrial[?]"

21

Defense counsel responded:

22

23

24

25

"Yeah, I think the cat[']s already out of the bag. I don't think in limine instruction would be able to cure — any other kind of remedy could cure that. It's so prejudicial. They heard he's on parole. I don't think they can keep any clear mind and that will tank their deliberation process and I don't see how to cure it."

26

27

The prosecutor argued that the evidence against defendant was consistent and the mention of his parole status, followed by the court's swift admonition, was not so prejudicial to warrant a mistrial.

28

The court stated:

11

"All right. The matter being submitted[; the] Court is weighing this carefully. I make the following findings:

"I do find that the offending testimony was not invited by the District Attorney. While this is highly speculative on my part it did not appear to the Court that it was a complicated or malicious comment by the witness.... The reference to the parole did not indicate the nature of the parole. So it, again, to some extent that invites speculation but on the other hand it does not point to a particular or type of crime or I think it's less offensive. [¶] Finally, ... the evidence in this case [was] uncontroverted with respect to who was the initial aggressor .... So there is uncontradicted testimony that placed [Ursula] in the position of being a victim and there seems to be no danger in the defendant's parole status contradicting to the jury's thought that he was the aggressor if it came down to a war of words and that may obviously be a circular argument standing as it does that it seems like there is a factor there that mitigates against that.

"So we're still left in the same position, is it — is this information incurable by nature and the Court finds that it is not properly and I would think unless there is an objection by the defendant I would think that an additional admonishment over and above where I've been now and where we've been before will — can cure mention. [¶] I also will say that both — all parties ... carried on with the — when we reconvene[d] carried on with the evidence."

## II. Analysis

"[E]xposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial. [Citations.] [¶] Whether in a given case the erroneous admission of such evidence warrants granting a mistrial or whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court. [Citation.] '"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." [Citation.]'" (People v. Harris (1994) 22 Cal.App.4th 1575, 1580-1581.)

We believe any conceivable prejudice was adequately cured by the court's admonition to the jury. But we also conclude that, even if it was not, the error did not harm defendant because the evidence against him was overwhelming. It was uncontroverted that defendant and Ursula were fighting and that Jason stopped to help Ursula by breaking up the fight. Ursula claimed she did not see a fight between defendant and Jason, but even she testified Jason was there to help her. Jason and Anita both testified that defendant struck Jason while he was merely attempting to break up the fight between defendant and Ursula. Furthermore, there was no substantial evidence that defendant acted in self-defense. First, even if Jason did pull defendant by the shoulders and tell him to stop hitting Ursula, as Officer Dennis recounted, Jason's act was inadequate to justify defendant's violent response. (See People v. Minifie (1996) 13 Cal.4th

12

1055, 1064-1065 [to justify an act of self-defense for an assault under §
245, defendant must have an honest and reasonable belief that bodily
injury is about to be inflicted on him, the threat of bodily injury must be
imminent, and any right of self-defense is limited to the use of such force
as is reasonable under the circumstances].) And second, contrary to
defendant's view, there was no substantial evidence that defendant
stabbed Jason after Jason hit him several times. Although Anita first
briefly stated the events in this order, when questioned further, she clearly
explained that she could not see whether defendant struck Jason again
and she did not know that Jason was injured until he hit defendant and
turned, allowing her to see the right side of his face. Then she testified that
she could not see and did not know whether defendant struck Jason a
second time. Thus, Anita's initial testimony that defendant struck Jason
after Jason hit defendant was not based on her personal knowledge and
was therefore insubstantial evidence on that point. Jason, on the other
hand, unequivocally testified that defendant struck him one time—before
Jason hit defendant several times in response. Accordingly, the evidence
overwhelmingly established that defendant stabbed Jason and did not do
so in self-defense. In light of this evidence, we believe the officer's
incidental remark about defendant's parole status was harmless. (People
v. Watson (1956) 46 Cal.2d 818, 836; Chapman v. California (1967) 386
U.S. 18, 24; see, e.g., People v. Allen (1978) 77 Cal.App.3d 924, 935
[improper reference to a prior conviction is nonprejudicial in the light of a
record that points convincingly to guilt]; People v. Harris, supra, 22
Cal.App.4th at pp. 1580-1581 [witness testified that defendants' parole
officers called her; any error harmless in light of overwhelming
evidence].)FN3

FN3: The erroneous introduction of evidence of a defendant's criminality
has been found to have been harmless in numerous additional cases,
such as People v. Ledesma (2006) 39 Cal.4th 641, 681-683 (reference to
defendant being on death row after earlier conviction in same case);
People v. Avila (2006) 38 Cal.4th 491, 572-574 (improper reference to
defendant's recent imprisonment); People v. Valdez (2004) 32 Cal.4th 73,
124-125 (police officer's inadvertent disclosure that he had interviewed
defendant in prison); and People v. Bolden (2002) 29 Cal.4th 515, 554-
555 (police officer's testimony that he went to parole office to get
defendant's address).

People v. Mendoza, 2011 Cal. App. Unpub. LEXIS 694 at 10-18.

       2.   Analysis

     It is well established that "there is a strong presumption that the court's curative

instruction was followed by the jury." Mancuso v. Olivarez, 292 F.3d 939, 952 (9th Cir.

2002). Consequently, it is only in "extreme situations [that] curative instructions will not

neutralize the prejudice when evidence is improperly admitted." Aguilar v. Alexander,

125 F.3d 815, 820 (9th Cir. 1997) (giving example of case where trial judge suggested

that firearms defendant was a murderer and a child molester).

     The case at hand is similar to Mancuso v. Olivarez, a Ninth Circuit habeas case

1    where, despite the trial court prohibiting any reference to Mancuso's parole status, a
2    detective testified to performing a "parole search" at Mancuso's apartment. 292 F.3d at
3    950. The trial judge reprimanded the detective outside of the presence of the jury and,
4    despite expressing concern that the improper testimony "jeopardized the entire trial,"
5    ultimately denied a motion for a mistrial and "carefully instructed the jury to ignore [the
6    detective's] statement." Id. at 950-51. The Ninth Circuit denied habeas relief on this
7    issue, relying in part on the curative instruction and in part on the conclusion that any
8    prejudicial effect was "diluted by the copious [other] testimony" at trial. Id. at 952.

9         Here, like in Mancuso, the improper testimony consisted of a fleeting reference to
10   an issue that might have been prejudicial, but was not an element of the crime. See id.
11   at 950. Also like in Mancuso, the trial court instructed the jury to disregard officer
12   Gregory's statement. People v. Mendoza, 2011 Cal. App. Unpub. LEXIS 694 at 10-18;
13   accord Mancuso, 292 F.3d at 950-51.

14        The state appeals court explained that even if the court's admonition was not
15   effective, the error was harmless because the evidence against Petitioner was
16   overwhelming, there was no evidence of self-defense, and all credible testimony pointed
17   to the fact that Petitioner stabbed the victim before the victim punched Petitioner. People
18   v. Mendoza, 2011 Cal. App. Unpub. LEXIS 694 at 10-18.

19        Under the circumstances, the California Court of Appeal reasonably rejected
20   Petitioner's claim.  As in Mancuso, "[a]ny prejudice that might have occurred as a result
21   [of the improper testimony] was diluted by the copious testimony and satisfactorily
22   ameliorated by the curative instruction." 292 F.3d at 952.

23        Petitioner is not entitled to federal habeas relief on this claim. The state court's
24   rejection of the claim was not contrary to, or an unreasonable application of, clearly
25   established Supreme Court precedent, or involved an unreasonable determination of the
26   facts. See 28 U.S.C. § 2254(d).

27   **B.    Claim Two – Reference to Parole Status Lowered Burden of Proof**
28        Petitioner, in his second claim, contends that the denial of the motion for mistrial

14

1   resulted in a lessening of proof on the issue of self-defense, and thereby violated his

2   right to a fair trial. (Pet. at 9.)

3                          1.   State Court Decision

4       In the last reasoned decision denying Petitioner's claim, the appellate court

5   concluded:

6           Defendant also asserts that the court's denial of the mistrial motion and
            admission of the prior crimes evidence lessened the prosecution's burden
7           of proof on the issue of self-defense. The People correctly point out that
            the court did not *admit* this evidence, but instead swiftly struck the
8           testimony and admonished the jurors to disregard it. Moreover, as we
            have explained, the evidence overwhelmingly supported the conclusion
9           that defendant did not act in self-defense. Again, any error was harmless.

10   People v. Mendoza, 2011 Cal. App. Unpub. LEXIS 694 at 18.

11                         2.   Analysis

12      Respondent notes that in Petitioner's petition for review to the California Supreme

13   Court, Petitioner cites Francis v. Franklin, 471 U.S. 307, 313-315 (1985) and Yates v.

14   Evatt, 500 U.S. 391, 402-403 (1991). (Lodged Doc. No. 2 at 19.) Responded contends

15   that both Francis and Yates address particular jury instructions that created an

16   impermissible mandatory presumption that affected the burden of proof, and that neither

17   case supports Petitioner's contentions. Francis v. Franklin, 471 U.S. at 316-317; Yates v.

18   Evatt, 500 U.S. at 401-402.

19      The Court agrees with Respondent. Neither case is supportive of Petitioner's

20   assertions. Moreover, Petitioner is simply incorrect when he argues that the Court

21   admitted the evidence regarding his parole status. The trial court immediately struck the

22   evidence and provided a curative instruction to the jury. Petitioner has not pointed to any

23   relevant federal law to support his claim, and the Court is not aware of any federal law

24   that may apply. In his traverse, Petitioner presents the same arguments and again relies

25   on Francis and Yates.

26      Accordingly, the state court adjudication of the claim did not result in a decision

27   that was contrary to, or involved an unreasonable application of, clearly established

28   Federal law, or result in a decision that was based on an unreasonable determination of

1    the facts in light of the evidence. 28 U.S.C. § 2254(d). Petitioner is not entitled to relief.

2    ## V.    CONCLUSION

3        Petitioner is not entitled to relief with regard to the claims presented in the instant

4    petition. The Court therefore orders that the petition be DENIED.

5    ## VI.   CERTIFICATE OF APPEALABILITY

6        A state prisoner seeking a writ of habeas corpus has no absolute entitlement to

7    appeal a district court's denial of his petition, and an appeal is only allowed in certain

8    circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute

9    in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which

10   provides as follows:

11
12       (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

13
14
15       (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

16
17       (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

18           (A) the final order in a habeas corpus proceeding in which the detention complained
19           of arises out of process issued by a State court; or

20           (B) the final order in a proceeding under section 2255.
21

22       (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
23

24       (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).
25

26       If a court denies a petitioner's petition, the court may only issue a certificate of

27   appealability "if jurists of reason could disagree with the district court's resolution of his

28   constitutional claims or that jurists could conclude the issues presented are adequate to

deserve encouragement to proceed further." <u>Miller-El</u>, 537 U.S. at 327; <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**VII.  <u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   March 25, 2014           /s/ *Michael J. Seng*
                                          UNITED STATES MAGISTRATE JUDGE